Bryant v. Colvin. May it please the court, my name is Marcia Ellen Anderson and I represent the appellant Sharon Faye Bryant, Desert Storm veteran, in her appeal of a denial of Social Security disability benefits. The standard of evidence supports the ALJ's decision and whether the correct legal standards were applied. In this case the ALJ committed three primary errors which then led to other errors such that the evidence upon which the ALJ based her decision was not substantial and the court below found the errors to all be harmless with the exception of one which they did not say whether or not it was harmless but the question becomes how many errors can be in a case before they being harmless. The primary one in this case was the failure by the ALJ to develop a medical record and obtain the VA records for this claimant when there was evidence in the evidence before the judge that there were evident records at the VA which would have been material to the case. The second thing the ALJ failed to consider at all the impairment of severe depression which was actually the primary impairment and the basis for one of her VA disability ratings and thirdly the ALJ had the ALJ obtained that missing evidence which was referred to throughout the evidence before her there would have been enough evidence for a finding of repeated episodes of decompensation which would have enabled the claimant to be found disabled. Now how could that be the case if these prior episodes were all occurred prior to the onset date in this petition? We can't consider that. Yes you can your honor. Tell me why. The duty of the commissioner is to fully develop the medical evidence and regulations state that this commissioner is supposed to go back at least 12 months prior to the alleged onset date and even further if there's evidence suggesting that it In this case the treating physician psychiatrist and one of the VA doctors that Ms. Bryant saw in 2008 referenced numerous hospitalizations for mental impairments and she actually had three attempted suicides. She had ten inpatient hospitalizations that were noted by the VA doctor and all of this would have been relevant to her current condition when she applied for disability benefits. It was all prior to onset. Not all. She did have one hospitalization when she was feeling suicidal in 2007 but that just again triggered that need to go back and look and see when these hospitalizations actually took place. We don't know how remote in time they were. They could have been as recently as 2004 or a little bit before that. What is your burden? My burden? The claimant's burden. Okay in the in the Social Security sequential analysis the claimant has the burden at steps one through four to prove disability and then the burden shifts to the commissioner to find jobs that the specific prior incidents. The claimant's burden is to provide evidence supporting disability. However, it's not solely up to the claimant to provide the evidence. It's up the commissioner has an affirmed duty to develop that evidence. And that's in the regulations? Yes. Yes and it's in the regulations yes yes your honor because and the court this court has found that it's not enough to rely on the claimant to provide the evidence that sometimes they don't aren't able to provide it all and if there is evidence that that that the commissioner is aware of they are they have the duty to go and develop. Well that evidence might have gone to this you know severity of the claim but again I ask you again how could evidence of decompensation prior to the onset date have established the disability claim here where you can't count those? Because it would just as in Byrd where the ALJ would not consider medical evidence after the date last insured and this court found that you needed to go back and provide retrospective consideration of that evidence because it related back to the original impairment of the post-traumatic stress disorder. In this case the post-traumatic stress disorder began in Desert Storm that was one of her impairments. She later developed the severe depression and then the bipolar and then she got EVA ratings for those two impairments but it was incumbent upon the commissioner to look at that other earlier evidence because it's it's it the beginning of her mental impairments all the way up to the present and would have supported her credibility and her testimony at the hearing which the ALJ for various reasons discounted. So you had to look back I'm having a little trouble with this because not because to establish disability back then but to bolster credibility with respect to disability now. Correct. Your Honor, can I get a water please? There were some on your table. We're equal opportunity water dispensers. You take your time. Yes, Your Honor. Yes, any time the Commissioner is faced with evidence that could possibly indicate disability they're supposed to go and develop that evidence. Now I was not I did not represent the client or the claimant at the administrative level and there was some question at the hearing as to whether evidence was lost and mislabeled and I'm not really sure what happened to that evidence but once it was before the ALJ she knew that there were episodes of decommunication as evidenced by the hospital repeated hospitalizations that were referenced in that evidence. In her decision she made a factual finding that was not correct. She said the Miss Bryant had only one or two episodes of decompensation and that right there was prejudicial to her case because had she found repeated Miss Bryant would have been found disabled under the effect of regardless of the onset date of those earlier? Correct, because those earlier episodes they don't have to be right within the time period before the Commissioner because it goes to the totality of the evidence. But that's different than saying that automatically they are counted as events of decompensation. They are automatically counted under the Commissioners. Yes. For purposes of considering the severity? For both your honor. So can you find that in the regulation? Yes it's in the regulations. Do you would you like me to cite to that? Please. Yes. I have a lot of papers here. Episodes of decompensation are described in appendix 1 to subpart P of part 404 listing of impairments under 12.00 which is mental disorders and in that it states that it actually defines episodes of decompensation. Exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. They may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation. They can be inferred from records showing significant alteration in medication, which was in this case, or documentation of the need for a more highly structured psychological support system, e.g. hospitalizations, placement in a halfway house, or a highly relevant information in the record about the existence, severity, and duration of the episode. And then it goes on to explain the extended duration means three episodes within one year or an average of one every four months, each lasting for at least two weeks. This evidence was critical because the reason why the alleged onset date was 2006 was that was a date she absolutely could no longer continue to work. And if you look at her work history after she got out of the service, she had very sporadic work history from 94 up until 2006. Each job lasted only a few months. She was fired from virtually all of them because she could not maintain, could not be on the job. And those VA records, which were ongoing while during the period of time that she alleged disability starting in 2006, would have had relevant evidence of these episodes of decompensation and seeing how far back they go. And it would have supported her current status of disability. Well did they have to be within, there had to be three of them within the previous year? I'm still, you've read me all that regulation. I had read part of that before and I wasn't quite sure what you were referring to. So you're saying that. I'm asking you. Okay, so your question is do those episodes of decompensation all have to be after her alleged onset date? Well that was the first question, that was the question Judge Diaz asked you and you said the answer was no. And then you relied on that regulation. And what, it's not correct for me what part of that regulation you're relying on. Right, correct. I think the simplest answer would be to say that in order to determine disability simply based on episodes of decompensation and nothing else, then yes I would say they would have to be after her alleged onset date of 2006. However, as probative evidence of her condition which began in 1989 and simply moved forward and never lessened and never went away, they don't have to be within. Where is the authority for that? You just told us that the regulation that you read us doesn't support that. It only talks about incidents past 2006. There may be a provision. Because, well your honor, when you look at the listing for affective disorders, which was the severe depression, was not mentioned or considered or named at all in the decision. You would have to have either four of the Part A criteria plus two of the B or only the C. Now under that it would be medically documented history of a chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support and one of the following repeated episodes of decompensation each of extended duration. Now I suppose there is a question as to whether those repeated episodes have to be within that time period after the alleged onset date because it actually says that the disorder, the affective disorder has to have lasted at least two years. And here it clearly has. And it continued to the present right into her period after her alleged onset date. So to revise my answer I would say that those repeated episodes of decompensation do not have to be after the alleged onset date as long as they are part of that chronic affective disorder of at least two years duration, which she clearly had. I wanted to mention that the ALJ had several factual errors in her decision that affected the entire outcome of that decision and that was not correct under this court's own cases. In Maestro v. Appel in 2001, this court said that under the Social Security Act, a reviewing court must uphold the factual findings of the secretary if they are supported by substantial evidence and were reached through application of the correct legal standard. So in this case she had several findings that were not correct factually and that would have influenced the outcome of the decision and so that her decision was not based upon substantial evidence. And I also wanted to mention that the fact that the consultative examination report of Dr. Harkani was not considered also adversely affected because that report contained an assessment of activities of daily living, which is a functional assessment that the agency wants to have in these cases. The agency paid for that examination, but the consultative examiner did not mention it or refer to it in any way and yet in another part of her decision she discounted the treating psychiatrist reports and opinion that the claimant was not working because of her mental impairments by saying it was not a functional assessment of her abilities. Thank you, Your Honor.  Thank you. May it please the court, my name is David Mervis and I'm here on behalf of the Acting Commissioner of Social Security. And I'd argue, I'd respectfully request that this court affirm the decision of the district court and find that substantial evidence did in fact support the final decision of the commissioner. And there are three reasons, there's three things worthy of discussion, but I want to start with what this court was discussing as far as the episodes of decompensation. As Your Honor, Judge Diaz pointed out, there is a question here, there are references in the record to hospitalizations that occurred prior to Ms. Bryant's alleged onset. And Ms. Bryant has contended that those episodes, if, excuse me, I shouldn't categorize them as episodes of decompensation, they are references to prior hospitalizations. Now if those prior hospitalizations were in fact episodes of decompensation, that still would not satisfy the listings because the listings are concerned with what Ms. Bryant's condition is from her alleged onset date forward. Would they be relevant? They could be, I would say, Your Honor, that they would be relevant, they could be relevant. In this case, the district court pointed out that they would be of less relevance if they were remote in time. Do we know that? Well, I would say, Your Honor, to that, that wasn't, I would submit, idle speculation on the part of the district court. We don't know the exact dates. But what we do know, and part of that reason, Your Honor, is that Ms. Bryant, though represented at all points by counsel, still hasn't produced any of these records. But, I would say, the reason that we know that they were at least at some removed from the alleged onset is because what Ms. Bryant herself acknowledges, points out in her brief, is that the district court, excuse me, I should say the ALJ, had before her some 40 pages of treatment records that extended prior to Ms. Bryant's alleged onset date. Her alleged onset date was in June of 2006. Her application date was in December, six months later. So, there is, as Ms. Bryant has pointed out in her brief, treatment records that go back as far as December of 2004. And in December of 2004, and that's at the, at page 325 of the administrative record. And what that treatment note discusses is past hospitalizations. So, there is evidence, there is suggestion that there were past hospitalizations. The commissioner doesn't dispute that. But they were at least two years prior to Ms. Bryant's application date. And, in fact, at that point were passed. So, what the ALJ had before her in this case was more than, well, 18 months of treatment records that extended prior to her, Ms. Bryant's alleged onset date. And, in fact, two years before her application date. So, the commissioner's position is that although the commissioner does have a duty, the ALJ has a duty to develop the record. That was, that was, this was not an abdication of that duty in this case. There were records that went well beyond, or well before Ms. Bryant's application. What if it was a year back? I mean, I don't, I kind of don't understand where we're picking this line. Well, Your Honor, the regulations do discuss, they don't, it's not a, it's not an automatic cutoff. But the regulations say that what the ALJ's duty, this is 404-512-D and 416-912, the corresponding one for Title 16. They speak of developing the record for 12 months prior to a claimant's application. However, there are caveats. Unless the claimant indicates that his or her disability began less than 12 months before the application. And that's what we have in this case. As a general overall matter, in terms of the listed impairments, why did you come to the conclusion ultimately that they were only moderate in severity? What was, what was crucial in that determination? Because if you, if you, if she qualifies under a listed impairment, that's it. That's correct, Your Honor. And you don't get into Step 5. That's correct. Whether she can perceive, whether she can hold other jobs and whether there are jobs in the economy. You can wrap it up at Step 3. That's correct. Um, maybe you're due the benefit of the doubt because whether something is of moderate severity or marked severity is probably a substantial part of the evidentiary question. And the ALJ listened to the evidence on it. But, um, why wouldn't she qualify under a marked severity standard given the fact that she can't hold down a job for more than a very short period of time? Other than her family, you know, she has a real aversion to being around people. And people made her paranoid. And it's this invariable distrust and fear, really. You read the record, there's this invariable fear of other people that makes it very difficult for her to hold down a job for any more than several months at a time. And so what makes this, I realize it's an evidentiary question. And I defer to the ALJ for that reason. And also, the ALJs deal with this problem day in and day out. And that their familiarity is more likely to ensure consistency of result than us sort of taking a single appeal on an episodic basis and say, well, this person is deserving because we have to consider it in conjunction with many, many other cases and making sure that there's a basic consistency along the line. But why is this woman's impairment only moderate? I mean, just put it in layman's terms, she seemed in pretty bad shape. Well, Your Honor, I'd respond in the following way. Certainly this, as Your Honor pointed out, there's an evidentiary question. And the ALJ reviewed the evidence of record. But what I would say specifically is that the ALJ cited in what the district court said was an especially exhaustive and thoughtful review of the treatment notes from Dr. Dimitrova. I don't know if I'm pronouncing that correctly. Well, let's go to the treatment notes because that was the question dovetailing with what Judge Wilkinson said because in his notes, he also talks about moderate. But there are five categories there. There's none, minimal, mild, moderate, severe. So moderate is the second highest, whereas in the ALJ standard, there are only four categories, none, minimal, none, I'm sorry, none, mild, moderate, marked, and extreme. So moderate is in a different place in the ALJ standard. So I'm not sure you can, since it was the second highest in his and in the middle in hers, the word moderate. That is true as far as the word moderate. I take Your Honor's point. That is certainly true. Well, but you just started out saying that you relied on what the doctor said. Well, I think that I would stand by that, Your Honor, for the following reasons. There are occasional moderate rankings or ratings or however you'd like to put that in Dr. Dimitrova's treatment. Right, which according to him is the second highest. That's correct. Second most severe. That's correct, although I would say there's no translation between what Dr. Dimitrova considers moderate and what the commissioner considers moderate. The ALJ is tasked with assessing the medical records and making a determination as to what that means. It's not a, because the terms, as Your Honor points out, because the scale is different, there's not an easy comparison between the two. And to say that this is moderate but that's the second highest, so that necessarily means marked, would not be, I would say, the appropriate translation. But I would say that what you also, Dr. Dimitrova did have, there were some moderate ranked ratings. There were far more minimal, mild, and none. And so Dr. Dimitrova, well, I should say Ms. Bryant, her obligation, her burden, was to establish that she had these limitations, that they persisted for 12 months, and that they were of that degree of severity. And in this case, what you have is treatment records that, as the ALJ pointed out, go up and show up and downs, ups and downs. However, there are far more none, mild, and minimals than there are moderates. And in fact, after December of 2007, the ratings in March of, excuse me, February of 2008 at Administrative Record 393, and the ratings at July of 2008 at Administrative Record 401, there was simply mild, depressive, and none on everything else. And so the commissioner takes the point the court is making. There were certainly limitations, and the ALJ accounted for those limitations. I think it's important to note that what the ALJ does and did in this case is assess the medical records and then craft or make a finding as to a residual functional capacity based on those limitations. So as Judge Wilkinson, Your Honor, pointed out, there were limitations. There were issues with dealing with other people. And that's precisely why the ALJ, in finding her residual functional capacity as she did, limited her to occasional contact with coworkers, what the ALJ noted, and the general public, what the ALJ described as essentially isolated work with only occasional supervision. Other limitations as well. But I think it's important to point out that there are, it's not a simple off-on switch, work or not work. There's work at, with this specific residual functional capacity, taking into account Ms. Bryant's specific impairments and the limitations that were caused by those impairments. So in this case, there's substantial evidence. You're saying that a large part of her medical history is just irrelevant because it's obsolete? I mean, because it's stale? No, no, I wouldn't categorize it that way. Is Your Honor referring to hospitalizations that may have occurred before her alleged onset date? Or, if I misunderstood, I apologize. Well, the four diagnostic forms that Dr. Shremantrava completed in 05 and the nine in 06, numerous psychiatric evaluations, she's under continuing treatment by the, was under continuing treatment. She's got a huge number of medications. The Baltimore Veterans Affairs Center has her under medication, I guess, because the bipolar disorder and the post-traumatic stress disorder and the borderline personality disorder are all, I guess, part of it arose from her service in Iraq? And Your Honor, that's sort of beyond the record. I'm not certain. That may be, but that wasn't specifically. It sounds like it could be. It may be. And then what about the, she had to be removed from an abusive marriage by her adult son. And she was depression to the point of being suicidal, and there were two attempts to hang herself and one attempt to drown herself. And, you know, it just gets to the point, and we're saying that all of these things are simply moderate? Well, Your Honor, I think. I mean, is it true that she made two attempts to hang herself and one attempt to drown herself? There are references to. And that she had to be removed from an abusive marriage of 17 years by her adult son? Certainly the record establishes that there were, that the marriage was an abusive relationship. What about suicide? There was one suicide, there were discussions, comments, suicidal comments in July of 2006, and that's during the period that the ALJ specifically noted. There are references to. The specifics. She alleges on page five of her brief that she made two attempts to hang herself and one attempt to drown herself, and that she was hospitalized by Dr. Dimitrova because of the attempt to commit suicide by drowning herself. That was prior to her alleged onset date, to the extent. Prior to what? Prior. It's uncertain, Your Honor. Prior to December of 2004 at least. Which is, you say, the onset date. No, that's even earlier. The onset date that was alleged was June of 2006. Ms. Bryan was, of course, free to allege an onset date that was earlier, but that's not what she did. I mean, aren't all these problems part of the continuum? I mean, can we really sort of chop them up into little time segments? Well, Your Honor, I think that does get to a point that I believe Judge Diaz pointed out to opposing counsel, that there's a different issue. There's whether these things count as specific check boxes on the listings in that form. And then there is a question of general severity. And it's the severity point that I'm, because I don't think, are we restricted in our consultation of the evidence in terms of the degree of severity? No, Your Honor, but I would say that the evidence that the ALJ had before her, that ran during the relevant period, during the alleged onset date through the ALJ's decision, paints a very different picture than the one that you're at this point. Why do you say that? I've mentioned some factors that give me concern about her being in a state of marked disability rather than simply moderate severity. And why do you say it's all just moderate? Well, again, Your Honor, I'd point to the ALJ's assessment, of course, the state agency consultants who reviewed the records that existed at that time. That would be Dr. Peterson and Dr. Sokas. Both reviewed, they conducted their reviews at different times, but the records that were available to them at that point in time, in March of 2007 and June of 2007, and they both concluded that Ms. Bryan had moderate limitations and not marked limitations. Your Honor is certainly correct that there were issues in this case, as I've said, that there were limitations and that Ms. Bryan suffered from a number of them. Well, as I say, my problem is I don't have a sufficient universe of these cases, and some of the things that are pointed to are distressingly very commonplace among the population. And so you don't want the award of benefits to be random or capricious, and the administrative process is probably the best hedge against that. So I understand the substantial evidence question. I understand the expertise question. I understand the consistency thing. And all of those are advantages that the administrative process brings to the determination, and I grant you those. But, you know, there's another part of me just as a layperson, which in a way I am here because it's a heavily medical case, that just seems to me that there are or she has a really hard time getting on with life. And I certainly don't want to misstate. A lot of which really isn't her fault. You know, you can't, and you're not doing that, but these things, these situations arise from people who find themselves sometimes caught in, you know, who serve the country in the military or find themselves caught in very difficult marriage situations, and it's not their fault. And, you know, it may seem like a small case, but it's everything to the litigants, and I'm just, you know, torn by it because I think she has a hard time getting on. I certainly share your concern. I don't mean to diminish or minimize her issues and her limitations, and certainly there's no allegation that she is able to function at full level, and that's why the residual functional capacity assessment that the ALJ does, that the ALJ finds, does include limitations. But you don't dispute the fact that there were three suicide attempts? Your Honor, I do dispute that. You don't dispute the drowning? Your Honor, I believe there were references to prior suicide attempts. Well, that's why she was hospitalized. Well, I believe, Your Honor, there was one suicidal comment, I believe, in July of 2006. I believe there were also references prior to that point. But from the period, certainly from her alleged onset date on, there was evidence of only one hospitalization, and that, in fact, goes back further, back to December of 2004. There's no evidence that I'm aware of additional. Did the ALJ make findings one way or the other as to the suicide attempts? The ALJ noted the July 2006 hospitalization for suicide. Threat to commit suicide, not an actual attempt. That's my understanding, Your Honor, is that in July. Was it simply incidents, threats, or attempts? My understanding, Your Honor, is in July of 2006, there were suicidal threats. I don't believe there were suicidal attempts during the period between 2004, December of 2004, all the way through 2000. Is there a question of, in your view, is there a question of malingering here, that a lot of times one advantage that a fact finder has as an ALJ is you hear the actual plaintiff, and you can determine sometimes whether things are genuine or whether somebody's exaggerating them for purposes of the hearing. And so demeanor evidence plays a big part in this, in the ALJ's assessment of exaggeration. Did the ALJ say something about the fact that there was a credibility problem with the plaintiff? Your Honor, the ALJ, and I see my time is up, but I'd like to answer. The ALJ does make a credibility finding. The ALJ in this case noted a couple of things, one of which wasn't necessarily that she was lying, but that she said she hadn't had any benefit, any improvement, since December of 2000, or I think it was just 2004, onward. And what the ALJ found was that that was inconsistent with Dr. Dimitrova's treatment notes, which showed ups and downs for a period, and then really improvement with medication, with consistent treatment. And I would say that it is a good thing, obviously, that Ms. Bryant is connected with treatment, and that it seems like, from Dr. Dimitrova's records, that that treatment is helping. Her later ratings, rankings, on these issues are better than her early ones. But in terms of the credibility. And so I raise it to make that point, that the ALJ found Ms. Bryant's statement that she hadn't had any improvement to be incredible.  The ALJ determines whether everything the claimant is saying is about the severity and the limiting effects are entirely credible. So that was one factor that the ALJ pointed to. All right. Do you have anything further? Were there other factors that you found not credible? I apologize, Your Honor. I did want to make... I thought you were about to say something. I wanted... I did note, or I would note, there was an issue that the ALJ pointed out, as far as alcohol use. And I don't want to overstate that, and I don't think this is a case where that really comes into play in terms of severity, but it does... well, it may. I shouldn't overstate that. But the ALJ did make a note that Ms. Bryant's testimony at the hearing was that she hadn't used any alcohol for several, I believe, several years at the hearing point. And the medical records from the VA and from, I believe it was from the VA, undermined that position. So that was another factor that the ALJ pointed to in making the decredibility determination. Thank you. Thank you. Ms. Anderson, pleased to hear from you in rebuttal. Thank you. Ms. Anderson, there's such a heavy presumption in favor of ALJ fact-finding in these cases, and this one just has a large element of credibility and assessment. Well, that's correct. And if we overturn these things, I don't know. You know, sometimes it's good. Sometimes people get disability benefits. They can kind of give up. And, you know, you might want to encourage them to find jobs and to think of themselves as capable rather than as incapable. Now, sometimes that's impossible because the burdens and the afflictions are just too great. Yes. But in other situations, you want to sometimes say, you know, try to make a productive go of things. And don't you change someone's self-image when you rule them? Isn't there a danger? There are two sides to this. Well, it's a case-by-case assessment of every individual who files for benefits. Some people are able to move on and other people are not. And in this case, she was not able to move on. I wanted to point out that the five-scale rating, you were exactly correct, moderate in Dr. Dimitrova's scale would equate to marked. And that's significant because that's supported by her global assessment of functioning scores, which the highest she found was 50. A 50 is a serious symptom, suicidal ideation, serious impairment in social, occupational, or school functioning, no friends, unable to keep a job. By 2008, the VA noted that it had gone down to 45, which is no friends, again, serious, suicidal, and so on. So Dr. Dimitrova's findings, I believe, were misconstrued, and I know it's not your role to reweigh the evidence, but she misconstrued them moderate as saying that they were meaning moderate in the measure of the commissioner rather than marked. The commissioner has a standard of marked. We do not define marked by a specific number of daily activities, daily living in which your functioning is impaired, and so on. You may have a marked limitation when several activities or functions are impaired, or even when only one is impaired, you need not be totally precluded from performing an activity to have a marked limitation as long as the degree of limitation seriously interferes with your ability to function independently, appropriately, and effectively. The term marked does not imply that you must be confined to bed, hospitalized, or in a nursing home. What about the fact that in the more recent notes, though, there was no dispute about the ultimate conclusions of the doctor were that your client's symptoms were minimal and or none. I mean, there's no debating that, no misconstruing that. And if there's a conflict in the evidence, I guess that just welcomes this point. How are we now to reweigh that evidence and overturn the ALJ on that conflict? True, except you're not supposed to reweigh the conflicting evidence. But in this case, the evidence was not complete because I would say that the vast majority of Dr. Dimitrova was, as we discussed, that the moderate probably equated to marked, although we can't know for sure, although that's what the district court, they were trying to do in equivalence. So you have all these VA records. We know she had a 30% disability rating for severe depression, the impairment the ALJ never discussed, in 2007. Then she had a 2008 rating of 40% for bipolar disorder. Under the VA formula, that means she was 60% disabled. Those records were ongoing at the same time as the period of time after the alleged onset date. They were at the very same time. And the records from the VA in 2008 showed that she was having a decline in her condition because of her gap of 45. The course of treatments represented all kinds of up and downs. Adjustments of medication, yes. Peaks and valleys. Yes, but at no time, Your Honor, was she ever functioning normally, even though she may have had some improvement. What about the periods of improvement, some of which had been quite recent? She had some periods of improvement, but that's relative to the overall picture. That's not improvement as to say now she is normal and doing great. That's where your opposing counsel said that is taken into account when assessing residual functional capacity. Someone may not be in optimal shape, but he or she can do some work. But they still have to be able to do some work. And that was a finding. I do not believe that the ALJ's findings were supported by substantial evidence in regard to finding that she only had moderate. I believe the evidence overwhelmingly shows that she had marked limitations. A lot of times we listen to cases and say, you know, maybe if this were the first instance we would have ruled in your favor, but that standard of review, it's a hard one to overcome. You know that. I do know that, Your Honor. But the missing evidence is the key here because the ALJ made factual findings that were not correct. This court's duty is to review the factual findings. And in reviewing those factual findings, see whether the ALJ was pretty careful. Well, her findings were incorrect. She said that the- Did the magistrate judge allude to the care that the ALJ- Yes, she did, Your Honor. However, the ALJ said that her 30% VA disability was for PTSD and was not. She didn't mention the- These are long and complicated medical records. Yes, Your Honor. There's always additional evidence of- But there was a specter here, Your Honor, of those missing records with those repeated inpatient hospitalizations and all those things from the VA. They were hovering in the background. They should have been located. Thank you so much. Thank you, Your Honor. We'll adjourn court and come down and greet counsel. This office has adjourned until tomorrow morning at 930. Godspeed, United States.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Albert Diaz